**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | **CRIMINAL NO. 20-CR-222-ABJ** |
| v. | ) | |
| | ) | |
| DEMETRIUS GREEN, | ) | |
| | ) | |
| Defendant. | ) | |

## DEMETRIUS GREEN'S MEMORANDUM
## IN SUPPORT OF SENTENCING

Demetrius Green, through counsel, submits the following memorandum in aid of sentencing. Based on all of the sentencing factors in this case, Mr. Green respectfully submits that a sentence substantially lower than the guidelines range is appropriate, fair, and reasonable in light of the applicable United States Sentencing Guidelines and the factors set forth by Congress in 18 U.S.C. § 3553(a).

## DEMETRIUS GREEN'S BACKGROUND

### I.    Family

Demetrius is a thirty-three year old man and lifelong D.C. resident. Demetrius was raised by his single-mother Deborah Jefferies in the Highlands Dwellings Public Housing project in Southeast, Washington, D.C. Mr. Green's father, Larry Green, passed away in 1996 when Demetrius was only six years old. Demetrius was close with his mother throughout his life, and her passing in 2015 has substantially and negatively impacted Demetrius.

Demetrius was raised alongside his twin sister Jasmiene, with whom he remains close, and also his older brother named Paris. He also has an older half-brother named Larry, with whom he shares a close relationship to this day. *See* Exhibit A (letter from Larry Green). Demetrius also had another older brother who unfortunately was stabbed and killed by a friend when Demetrius

was very young.  His siblings care deeply for Demetrius and have expressed that he is "incredibly smart," a "very funny and respectful person," and that he has "a lot to offer the world."  *See* Exhibits A and B (letters from Larry Green and Jasmiene Green).  Demetrius also has a 13-year-old daughter named Dior, who he considers his pride and joy.  Being a father to Dior has given Demetrius something more to live for, and that he recognizes that, as a parent, every decision he makes must be based on being a good father for his daughter.  He has provided monetary support to Dior when he has been able to do so.

## II.    Growing Up

After his father's passing, Demetrius's mother worked hard to raise her three children, making many personal sacrifices to ensure that Demetrius and his siblings had what they needed. But despite her best efforts, Demetrius had a difficult childhood due to poverty and growing up in a neighborhood rampant with violence. The Washington Highlands neighborhood where Mr. Green was raised "has long been one of D.C.'s most dangerous communities," is cut off from the economy, and has high unemployment and substandard schools.  *See* Pete Hermann, With a truce brokered over Zoom, one D.C. neighborhood goes nearly 100 days without a shooting (August 19, 2020), *available at* https://www.washingtonpost.com/local/public-safety/with-a-truce-brokered-over-zoom-one-dc-neighborhood-goes-nearly-100-days-without-a-shooting/2020/08/21/69f010a 8-e183-11ea-b69b-64f7b0477ed4_story.html.

In fact, between 2001 and 2004 (when Mr. Green was aged eleven through fourteen), Washington Highlands had the greatest number of homicides of any neighborhood in D.C.  *See* Exhibit C at 21, Chief of Police, A Report On Homicide in the District of Columbia, 2001-2004; *see also* Exhibit D at 3, Serge F. Kovaleski, "Homicides in D.C. Top 1992 Mark," The Washington Post, December 18, 1993 (noting the working class and poor communities of Marshall Heights and Washington Highlands "bore the brunt" of D.C.'s homicides in 1993).   Residents of

Washington Highlands also experience significant poverty.  When Mr. Green was age ten, 34 to 62 percent of residents in Washington Highlands lived below the poverty level, depending on the block (which was then defined as $12,674 in annual household income for a family of four), and only 12.9% of homes were owner-occupied.  *See* Exhibit E at 39, African American Environmentalist Association, Our Unfair Share 3: Race & Pollution in Washington, D.C.

Demetrius attended Ferebee Elementary, P.R. Harrison Junior High School, and Ballou High School until he was 16 years old.  Demetrius did not complete his education at Ballou High School,[1] but earned his GED in 2013, which Demetrius considers to be one of his proudest accomplishments.  During one period of incarceration, Demetrius also participated in Free Minds Book Club, which is a nonprofit that uses books, creative writing, and peer support to help incarcerated and formerly incarcerated youths.  At Free Minds, he worked with Free Minds co-founders Tara Libert and Kelli Taylor and participated in book clubs and writing workshops.  Demetrius's time with Free Minds resulted in a love of reading and writing poetry.  *See* Exhibit F (Free Minds letter in support of Mr. Green).  Demetrius fondly recalls writing a poem about his mom which she proudly displayed on her wall at home.  Demetrius believes that Free Minds changed his thinking and made him much more calm and reflective.

In addition to schooling, Demetrius has made efforts to secure gainful employment in the past.  In 2018, Mr. Green secured employment through Project Empowerment, and worked as

---

[1] Ballou High School has historically had poor graduation rates and test scores.  *See e.g.,* Perry Stein, *D.C. plans probe of Ballou High School following report questioning standards*, Wash. Post, (Nov. 29, 2017) (https://www.washingtonpost.com/local/education/dc-plans-probe-of-ballou-high-school-following-report-questioning-standards/2017/11/29/b196fc56-d532-11e7-95bf-df7c19270879_story.html) ("The school posted a graduation rate of 64 percent in 2017, up from 50 percent in 2012 . . . Test scores from 2016 showed that 8 percent of students met or approached meeting standards in math and that 9 percent met or approached meeting standards in English.  In 2017, those numbers increased to 10 percent in math and 22 percent in English. Still, those results fell well below the average scores for the District, with 51 percent of students meeting or approaching meeting standards in math and 53 percent in English.").

porter at Lynn Properties in Washington D.C.  Mr. Green was striving to attain his Commercial Driver's License from 2019 to 2020 before the COVID-19 pandemic disrupted his goal.  Demetrius was actively seeking employment in 2020 from websites including indeed.com, Rocket Jobs, ZipRecruiter, and Glassdoor.  *See* Exhibit G.  While incarcerated for the instant offense, Mr. Green has worked in the sanitation unit at CTF, has not received any disciplinary infractions, or used any drugs during his incarceration.  *See* Final Presentence Report ("PSR"), ECF No. 124 at 5.  As reflected in Exhibit H, Demetrius also received consistent negative urinalysis results during his period of supervised release.

### III.    **The Future**

Upon release, Mr. Green will have the support of his siblings Jasmiene and Larry.  *See* Exhibits A and B.  Jasmiene has offered to house Demetrius upon his release and provide him with support.  *See* Exhibit B ("I will be here to support him, and am more than happy to have him live with me while he gets back on his feet").  Likewise, Larry has agreed to offered Demetrius help secure near-term employment as well as with Demetrius's ultimate goal of attaining a Commercial Driver's License.  *See* Exhibit A ("I am a manager at Target and at the Gaylord Hotel, and I am committed to helping Demetrius get a job when he comes home. I also have told Demetrius that if he wanted to get a Commercial Driver's License, I would help him get a box truck so that he could have steady career as a truck driver.  He is enthusiastic about working, and I have confidence in his potential to be the man I know he can be.").

### **LEGAL STANDARD**

At sentencing, the district court must "devise a sentence that is sufficient but not greater than necessary."  *United States v. King*, 201 F. Supp. 3d 167, 170 (D.D.C. 2016) (quotations omitted).  To do so, the court "must first ascertain and consider the appropriate sentencing range recommended by the Sentencing Guidelines."  *Id*.  But the Sentencing Guidelines are not

mandatory, *see United States v. Booker*, 125 S.Ct. 738 (2005), and so the "court also must fully consider the sentencing factors identified in 18 U.S.C. § 3553(a)," *King*, 201 F. Supp. at 170. These factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed--
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

18 U.S.C. § 3553(a).

18 U.S.C. § 3553(a) further directs the sentencing court to consider the range of sentences available, the need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offenses charged. The sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, mental and emotional conditions, and lack of guidance as a youth. 18 U.S.C. § 3661. Congress has further provided that the sentencing court must recognize that "imprisonment is *not* an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a) (emphasis added).

When determining an appropriate sentence, the court must not weigh the Sentencing Guidelines more heavily than these other sentencing factors. *See Rita v. United States*, 551 U.S. 338, 351 (2007) ("the sentencing court does not enjoy the benefit of a legal presumption that the

Guidelines sentence should apply").  As the D.C. Circuit has emphasized, "the Guidelines are truly *advisory*."  *United States v. Gardinelli*, 545 F.3d 1089, 1096 (D.C. Cir. 2008) (emphasis in original) (upholding non-guideline sentence of probation and a fine for defendant where Guideline range was 10-16 months).  Indeed, the sentencing court is not to presume a sentence within the Guideline range is reasonable, that such a sentence is more reasonable than a sentence outside of the Guideline range, or that a sentence outside of the Guidelines range is unreasonable.  *See Gall v. United States*, 128 S.Ct. 586. 596–97 (2007) (upholding sentence of probation in drug dealing case where range was 30 to 37 months).  Rather, the sentencing court must "filter the Guidelines' general advice through § 3553(a)'s list of factors" to arrive at an appropriate sentence.  *Rita*, 551 U.S. at 358.

Accordingly, the sentencing court must tailor an individualized sentence that achieves § 3553(a)'s objectives in the case before it.  *Rita*, 551 U.S. at 348, 350; *see also Gall*, 552 U.S. at 52 ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.") (citation omitted).

## <u>ARGUMENT</u>

For the following reasons, a sentence substantially below the Guidelines range is the only sentence that is sufficient, and not greater than necessary, for the purposes of sentencing.

## I.      Sentencing Guidelines Calculation

Probation has calculated Mr. Green's total offense level at 32, which comprises of a base offense level (28), a specific characteristics of the offense adjustment (2), and a career offender enhancement (2).  ECF No. 124 at 11.  Probation also calculated that Mr. Green's criminal history category is category VI due to application of the career offender guideline.  *Id*. at 18; USSG §

4B1.1.  Absent the application of the career offender guideline, Mr. Green's total offense level would be 30 and his criminal history category would be IV.  The sentencing range for an offense level of 30 at criminal history category IV is 135 months to 168 months.  But due to the application of the career offender guidelines, the sentencing range is 210 months to 262 months, or approximately 18 to 22 years.  ECF No. 124 at 29.

Such a sentencing range is excessive, and far greater than necessary to achieve the aims of § 3553(a).  Indeed, sentences recommended by the career offender guideline are chief among the most severe and least likely to promote sentencing purposes in the United States Sentencing Guidelines Manual.  *See* U.S.S.C., *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* at 133-34 (2004).  Neither the severity of the guideline, nor its breadth, was the product of careful study, empirical research, or national experience.  *See generally* Amy Baron-Evans et al., *Deconstructing the Career Offender Guideline*, 2 Charlotte L. Rev. 39 (2010).  The guideline has been vehemently challenged as having an unwarranted adverse impact on minority groups without clearly advancing a purpose of sentencing, and as leading to mass- and over-incarceration, especially as to drug-trafficking-only offenders.  *See id.*

The application of the career offender enhancement, and consequently criminal history category VI to Mr. Green's guidelines calculation, is improper because his prior D.C. possession with intent to distribute convictions do not qualify as "controlled substance offenses" under § 4B1.2(b) because they include attempted offenses.  And regardless, because the application of the career offender guideline, and a criminal history category greater than III *vastly* overstates Mr. Green's criminal history, a downward departure pursuant to U.S.S.G. § 4A1.3 is warranted.

A.      **Mr. Green's Criminal History Does Not Warrant Application of the Career Offender Guideline under the Categorical Approach**

Mr. Green's prior D.C. "Distribution of a Controlled Substance (PCP)" offenses do not categorically qualify as a "controlled substance offenses" under § 4B1.2(b) because they include attempted controlled substance offenses. *See* Exhibit I, Sent'g Transcript in *United States v. Privott*, No. 8:20-cr-240, at 25-29 (D. Md. Nov. 18, 2022) (finding D.C. possession with intent to distribute PCP is not a "controlled substance offense" under the Guidelines); *see also United States v. Branch*, No. 21-cr-145 (D. Md.) (finding that Maryland PWID failed to qualify as a § 4B1.2(b) "controlled substance offense" because "distribution" as defined by Maryland law criminalized the "attempted transfer" of controlled substances); *United States v. Young*, No. 22-cr-05, ECF No. 58 (D. Md. Jan. 9, 2023) (same).

The Sentencing Guidelines provide that a defendant will be sentenced as a "career offender" if, among other requirements, "the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 4B1.1(a)(3). The Guideline at § 4B1.2(b) defines a "controlled substance offense" as

> an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense.

USSG § 4B1.2(b).

In order to determine if a prior state offense qualifies as a predicate offense under this definition of a "controlled substance offense," courts use the "categorical approach." *See, e.g.*, *United States v. Williams*, 898 F.3d 323, 333 (3d Cir. 2018); *United States v. Townsend*, 897 F.3d 66, 72-73 (2d Cir. 2018); *United States v. Campbell*, 22 F.4th 438, 441 (4th Cir. 2022); *United*

8

*States v. Hinkle,* 832 F.3d 569, 572 (5th Cir. 2016); *United States v. Havis,* 927 F.3d 382, 384-85 (6th Cir. 2019) (en banc).

This approach requires that courts "look only to the statutory definitions—*i.e.*, the elements—of a defendant's [offense] and not to the particular facts underlying [the offense]" in determining whether the offense qualifies. *Descamps v. United States*, 570 U.S. 254, 261 (2013) (cleaned up); *Shular v. United States*, 140 S. Ct. 779, 784 (2020) ("A court must look only to the state offense's elements, not the facts of the case or labels pinned to the state conviction" in determining whether an offense qualifies as an ACCA "serious drug offense"). In addition, because courts "examine what the state conviction necessarily involved, not the facts underlying the case, [courts] must presume that the conviction rested upon nothing more than the least of the acts criminalized." *Moncrieffe v. Holder*, 569 U.S. 184, 190 (2013) (cleaned up). Under the categorical approach, a state conviction cannot serve as a predicate "controlled substance offense" if the state law under which the conviction occurred is categorically broader (in other words, if it punishes more conduct or prohibits more substances) than the definition of "controlled substance offense" in the Guidelines.

Returning to the definition of "controlled substance offense" as reflected in the Guidelines, the application notes provide additional commentary indicating that it "include[s] the offenses of aiding and abetting, conspiring, and attempting to commit such offenses." U.S.S.G. § 4B1.2, appl. n.1. But, in *United States v. Winstead*, 890 F.3d 1082 (D.C. Cir. 2018), the D.C. Circuit held that the definition of "controlled substance offense" does not include inchoate offenses, like attempts. *See id.* at 1091 ("Section 4B1.2(b) presents a very detailed 'definition' of controlled substance offense that clearly excludes inchoate offenses."). Thus, any state offense which *includes* inchoate offenses is categorically broader than the definition of "controlled substance

offense" in the Guidelines in the D.C. Circuit, and would thus fail to qualify as a predicate offense for purposes of the Career Offender Guideline.

For instance, the Fourth Circuit has held that a West Virginia distribution offense did not qualify as a "controlled substance offense" because the statute makes it "unlawful for any person to manufacture, deliver, or possess with intent to manufacture or deliver a controlled substance." *United States v. Campbell*, 22 F.4th 438, 442 (4th Cir. 2022) (quoting W. Va. Code 60A-4-401(a). And "deliver . . . means the actual, constructive or attempted transfer from one person to another of" controlled substances. *Id.* (quoting W. Va. Code 60A1-101(h)). Because West Virginia distribution included an attempt to transfer controlled substances, it categorically failed to qualify as a "controlled substance offense." *See id.*

The same reasoning applies to D.C. distribution offenses. The District of Columbia, like West Virginia, makes it unlawful to "manufacture, distribute, or possess, with intent to manufacture or distribute, a controlled substance." D.C. Code § 48-904.01(a)(1). "'Distribute' means the actual, constructive, or attempted transfer from one person to another" of controlled substances. D.C. Code 48-901.02(9); *see also* Redbook 6.202- Distribution of a controlled substance ("'Distribute' means to transfer or attempt to transfer to another person."). Like West Virginia distribution offenses, D.C.'s statute defines "distribute" to include "attempted transfer, and therefore Mr. Green's prior D.C. distributions offenses categorically cannot qualify as a "controlled substance offense" under § 4B1.2(b). *See* Exhibit I, Sent'g Transcript in *Privott*, No. 8:20-cr-240, at 25-29. Accordingly, the career offender guideline should not apply to Mr. Green.

### B.   A Substantial Departure or Variance Must be Applied Given The Facts and Circumstances of Mr. Green's Prior Offenses.

Mr. Green's criminal history, which stems from two street-level sales of small quantities of PCP when he was a teenager and not any crime of violence, is precisely the type of criminal

history to which the career offender guideline should *not* apply.  In fact, the United States Sentencing Commission has recommended to Congress that the career offender provision should *only* apply to those with at least one violent crime and not to those with drug-only offenses. U.S.S.C., *Report to the Congress: Career Offender Sentencing Enhancements*, August 2016, https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/criminal-history/201607_RtC-Career-Offenders.pdf.

Courts do not hesitate to grant downward departures under U.S.S.G. § 4A1.3 when the application of the career offender guideline overstates a defendant's criminal history.  *See United States v. Spencer*, 25 F.3d 1105 (D.C. Cir. 1994) ("If the court had determined that [defendant's] criminal history was so minor that it rendered his an 'unusual' career offender case, we see no reason why the court could not invoke § 4A1.3 to depart downward"); *United States v. Clark*, 8 F.3d 839 (D.C. Cir. 1993) (holding it is reasonable to depart downward from the levels generally applied to career offenders for a defendant for whom such levels would over represent the criminal history); U.S.S.G. § 4A1.3 (If a "defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted.").

Such downward departures are especially common for defendants with criminal histories similar to Mr. Green.  The Sentencing Commission has documented the increasing frequency of sentencing variances below a career offender range, particularly for those whose career offender status rested on drug offenses rather than violent crimes.  For example, the Commission reported that, by fiscal year 2014, judges imposed a sentence below the career offender range in roughly 75% of drug-based career offender cases, frequently choosing a sentence close to the non-career offender drug guideline.  *See* United States Sentencing Commission, Report to the Congress:

Career Offender Enhancements 35 (2016).  In fiscal year 2021, 54.8% of all career offenders sentenced under the Guidelines Manual received a variance, with 99% receiving a downward variance and an average sentence reduction of 41.2%.  *See* U.S.S.C., *Quick Facts: Career Offenders* (Fiscal Year 2021), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Career_Offenders_FY21.pdf.

A downward departure is appropriate here because Mr. Green's prior offenses involved only drugs, were minor, are remote in time, and took place when Mr. Green was a teenager.  In particular, Mr. Green's two offenses took place within months of each other, on December 9, 2008 and February 6, 2009, over ten years before the instant offense, and when Mr. Green was eighteen and nineteen years old.  Both offenses involved street-level sales of PCP, in one case, a hand-to-hand sale of a single cigarette dipped in PCP during a bust/buy operation.  Mr. Green pled guilty to two counts of distribution of PCP in the District of Columbia Superior Court in March of 2009 and was sentenced under the Youth Rehabilitation Act ("YRA").  Mr. Green's only conviction since the 2009 conduct is for unlawful entry of private property in 2019, a misdemeanor unrelated to drugs or violence, and was handled in family court.  A substantial departure and/or variance is therefore necessary to avoid unwarranted sentencing disparities.  *See United States v. Moore*, 209 F. Supp. 2d 180, 185 (D.D.C. 2002) (J. Sullivan) (finding defendant's criminal history significantly overrepresented under career offender range due to four years between commission of prior drug offenses and instant offense, small quantity of drugs involved in prior offenses, and relative length of prior sentences compared to instant offense); *United States v. Wheeler*, No. 04CR.424-15(RWS), 2004 WL 2646625, at *7 (S.D.N.Y. Nov. 18, 2004) (granting one-level horizontal departure and eight-level vertical departure due to remoteness of three prior convictions, the small drug quantities in earlier offenses, and the significant disparity between the sentences imposed

versus the career offender guideline); *U.S. v. Lamb*, 214 F. App'x 908 (11th Cir. 2007) (affirming 239 month below-guideline sentence in case involving drugs and firearm offenses in part due to defendant's youth when he committed the crimes that made him a career offender and his employment at Humane Society); *see also United States v. Corner*, 598 F.3d 411, 416 (7th Cir. 2010) ("Because § 4B1.1 is just a Guideline, judges are as free to disagree with it . . . No judge is required to sentence at variance with a Guideline, but every judge is at liberty to do so.").

### C.     Mr. Green's Criminal History Category Is Overstated.

Departing from the career offender guideline would place Mr. Green in criminal history category IV, but category IV also overstates Mr. Green's criminal history for three reasons.  *First*, Mr. Green's minor and remote criminal history warrants a downward departure.  The application notes to U.S.S.G. § 4A1.3 provide that as to all defendants (not only career offenders), "[a] downward departure from the defendant's criminal history category may be warranted if, for example, the defendant had two minor misdemeanor convictions close to ten years prior to the instant offense and no other evidence of prior criminal behavior in the intervening period."

Here, Mr. Green's conduct of street-level dealing of small quantities of PCP in 2008 and 2009—when he was eighteen and nineteen years old—alone amount to four criminal history points.  Mr. Green's other three criminal history points are for misdemeanor conduct in 2019 and because he was on probation during the instant offense, and following a lengthy period of law abiding behavior.  Courts routinely grant downward departures to defendants with similar criminal histories.  *See, e.g*, *United States v. Robinson*, 991 F. Supp. 1, 3 (D.D.C. 1997) (granting downward departure under § 4A1.3 where defendant had prior conviction for possession of heroin at age nineteen, had been sentenced under the YRA, and was on probation at the time of the prior offense); *United States v. Rodriguez*, 741 F. Supp. 12, 14 (D.D.C. 1990) (granting downward departure under § 4A1.3 where defendant had prior conviction for possession of stolen property at

age seventeen and was on probation at the time of arrest); *United States v. Williams*, 432 F.3d 621, 623 (6th Cir. 2005) (affirming grant of two-level downward departure because prior convictions were nine or ten years prior to instant offense); *United States v. Mapp*, No. 05-80494, 2007 WL 485513, at *3 (E.D. Mich. Feb. 9, 2007) (granting two-level downward departure because prior convictions were eleven years prior to instant offense, occurred during a two year window defendant was in his late teens, and they each involved relatively small amounts of narcotics); *see also United States v. Beckham*, 968 F.2d 47, 54–55 (D.C. Cir. 1992) (remanding case for resentencing because district court did not recognize guideline "explicitly suggests that departure might be warranted where the convictions supporting a criminal history score are old—'close to ten years prior to the instant offense'—and where a lengthy period of law-abiding behavior has intervened").

*Second*, Mr. Green's childhood circumstances make evident that his criminal history is overstated.  The D.C. Circuit has held that district courts are "free to consider whether a nexus exists between the circumstances of [a defendant's] childhood and his prior criminal offenses, for purposes of determining whether the seriousness of his criminal record is overrepresented under § 4A1.3."  *United States v. Clark*, 8 F.3d 839, 845 (D.C. Cir. 1993).  As noted above, Mr. Green grew up with few resources, in a very violent neighborhood, and was raised by a single mother.  Such circumstances undoubtedly have a nexus to Mr. Green's prior offenses, warranting a lower criminal history category than category IV.

*Third*, under the amendments to the Guidelines set to take effect in November of this year, Mr. Green would no longer receive two status criminal history points under § 4A1.1 for committing the instant offense while under a criminal justice sentence because he does not otherwise have seven or more points under § 4A1.1(a)-(d).  *See* Amendments to the Sentencing

Guidelines dated April 27, 2023, Effective November 1, 2023 at 77 ("Amendments"), *available at* https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf.   According to the Sentencing Commission, this amendment is necessary, in part, because published reports reflect that status points "add little to the overall predictive value" of the likelihood of a defendant's future recidivism.   Amendments at 77-78. Hence, if Mr. Green were to be sentenced in November, absent application of the career offender guideline, he would receive five criminal history points and would fall under criminal history category III.   The Court should vary downwards from criminal history category IV to avoid Mr. Green being arbitrarily punished to a greater degree solely because his sentencing hearing is occurring in May, not November.

In sum, for purposes of sentencing, Mr. Green's criminal history category is, at worst, category III.   Assuming a departure from the career offender guideline, and the application of a criminal history category of III, Mr. Green's guidelines range is at best 121 months to 151 months, or 10 to 12.5 years.   But a sentence substantially lower than this range is appropriate as is clear when "filter[ing] the Guidelines' general advice through § 3553(a)'s list of factors."   *Rita*, 551 U.S. at 358.

II.   **18 U.S.C. § 3553(a) Factors**

The § 3553(a) factors show that a variance from the Guidelines range is also warranted.

A.   **Nature and Circumstances of the Offense**

Mr. Green was charged and found guilty of non-violent offenses based on largely circumstantial evidence that led the jury to conclude that he had constructive possession of the drugs and firearms found at 917 Wahler—a dwelling where Mr. Green was staying at the time because he was "essentially homeless."   ECF No. 125 at 2.   There is no dispute that Mr. Green was not on the lease for 917 Wahler, there was no evidence that Mr. Green had any relationship or

communications with whomever owned or maintained 917 Wahler, or that Mr. Green had any stable housing situation at the time he was arrested.

While Mr. Green was present at 917 Wahler when the government executed a search warrant, the Government did not present any direct evidence that Mr. Green possessed with the intent to distribute or distributed the specific drugs seized from 917 Wahler, whether individually or in concert with others.  For example, the Government presented no evidence of Mr. Green having sent text messages or made phone calls in regard to any of the controlled substances recovered from 917 Wahler.  Nor did the government present any direct evidence establishing any alleged "role" Mr. Green may have played with regard to drug distribution.  There was no eyewitness testimony or any other direct evidence indicating that Mr. Green was involved in distribution of the seized drugs, testimony from any individual who acquired or purchased the seized drugs from Mr. Green, testimony or evidence of anyone who was somehow victimized as a result of Mr. Green's constructive possession of the seized drugs, or any evidence of proceeds from distribution of the seized drugs on Mr. Green's person, his effects, or bank accounts.

As to the firearm, the Government presented no direct or circumstantial evidence that Mr. Green purchased the firearm or that it in fact belonged to him, or that he held the weapon on more than a single occasion.  Evidence at trial reflected that the firearm was recovered from a communal closet in 917 Wahler, and there was no dispute that DNA from a male other than Mr. Green was present on the firearm and comprised of almost all the DNA found on the gun.[2]  More important,

---

[2] In addition, the Government's own evidence at trial showed that there were other individuals connected with 917 Wahler, including a DMV letter addressed to Roneka Jennings, a debit card with the name Roneka Eaton, an automotive repair slip with the surname Flemming, and various clothing and other effects which were not proven to belong to Mr. Green.

there is no evidence that Mr. Green ever used the weapon in order to injure others or to threaten human life.

In the face of its very circumstantial case against Mr. Green, the Government offered a plea that would result in a guideline range of 41-51 months, and agreed to cap its allocution to 48 months.  *See* ECF No. 82 at 62 ("There was a plea offer placed on the record at our last—or, a prior status hearing in the spring, which called for an estimated guidelines range of approximately four years to just the drug charge").  The Government's own view of the nature, circumstances, and seriousness of Mr. Green's charges underscores the need for a substantial variance from the guidelines range.  While Mr. Green did not accept the plea and was found guilty of serious charges, given the nature and circumstances of the offenses were non-violent, a sentence substantially below the guidelines range is appropriate to ensure a sentence that is sufficient, but not greater than necessary to achieve the aims of 18 U.S.C. § 3553(a).  *See United States v. Boykin*, No. CR 14-201 (EGS), 2020 WL 6193838, at *4 (D.D.C. July 16, 2020) (J. Sullivan) (offense involving the distribution of drugs and possession of a firearm observed to be "very serious" but nonviolent and did not raise a direct threat to the community).

## B.      History and Characteristics of the Defendant

As explained above, Mr. Green grew up with very few resources and in a violent, underserved neighborhood.  This should be considered by the Court when fashioning Mr. Green's sentence and in considering a variance from the Guideline range.  *See U.S. v. Lopez*, 938 F.2d 1293, 1297-99 (D.C. Cir. 1991) (remanding case for district court to reconsider sentence imposed for drug offenses in part because of defendant's "deprived background").

Mr. Green also has the support of his family and is fully committed to serving as a fully-present father for his daughter, Dior.  Additionally, Mr. Green is not a drug user, and as reflected in Exhibit H, has received consistent negative urinalysis results while on supervision.  While

incarcerated for the instant offense, Mr. Green worked in the sanitation unit at CTF, and has not received any disciplinary infractions during his incarceration. *See* Presentence Report at 5; *Pepper v. United States*, 562 U.S. 476 (2011) (evidence of a defendant's post-sentencing rehabilitation can be taken into account by the sentencing court). The Court should consider all of these facts in imposing a sentence that is sufficient but not greater than necessary.

### C.   Adequate Deterrence

Mr. Green has already been sufficiently and severely punished; a lengthy sentence is not necessary to provide further deterrence. Indeed, evidence shows that lengthy prison sentences do not have a "chastening" effect and "produce at best a very modest deterrent effect." Five Things About Deterrence, Nat'l Inst. Justice, U.S. Dep't of Justice (May 2016) at 1-2. To the contrary, research shows conclusively that "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime." *Id.* (emphasis in original). Significantly, "the crime prevention benefit falls far short of the social and economic costs," *id*. at 2, especially in light of U.S. Sentencing Commission "research [that] has demonstrated that reductions to sentence length and time served do not harm public safety," Transforming Prisons, Restoring Lives, Charles Colson Task Force on Federal Corrections, Urban Inst. (Jan. 2016) at 21. *See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardoza J. Conflict Resolution 421, 447-48 (2007) ("Certainty of punishment is empirically known to be a far better deterrent than its severity.").

Here, Mr. Green has been incarcerated at both DC Jail and CTF (DC-DOC) for almost the entirety of the more than two and half years of his criminal proceedings, including during the height of the COVID-19 pandemic, which in turn resulted in harsher-than-usual conditions of

confinement.  COVID-19 rampaged through the two DC-DOC facilities Mr. Green has been held, causing extraordinary fear among the inmates and resulted in "lock-down" type conditions.  These conditions were particularly onerous during the surge of the Delta variant of the virus during the summer to fall of 2021, as well as during the surge of the Omnicron variant in early 2022.  The unusually harsh conditions of confinement, including lengthy "lock-downs" and rampant uncertainty, has no doubt added to Mr. Green's punishment in this case.  Likewise, the mental strain and stress the fear of becoming infected and possibly suffering severe long-term health consequences Mr. Green experienced while incarcerated not only added to his punishment, but is also a deterrent to being incarcerated again in the future.  Not having the control to maintain proper social distancing and exercise proper hygiene to reduce the risks of contracting the virus have been real concerns for those persons incarcerated in DC-DOC facilities, as well as within the BOP.

Beyond the impact of the pandemic on Mr. Green's incarceration, the conditions at the DC Jail have also generally been dire.  In the fall of 2021, the United States Marshal Service conducted an unannounced inspection and review of all DC-DOC facilities which concluded that there was evidence of "systemic failures" at the central detention facility, including that water and food appeared to be withheld from detainees for punitive reasons, standing human sewage was left in the toilets of multiple occupied cells, the water in many cells had been shut off for days at a time, and DOC staff were observed antagonizing detainees, among other concerns.  *See* Exhibit J;  *see also* Madeleine Carlisle, "The Crisis at the D.C. Jail Began Decades Before Jan. 6 Defendants Started Raising Concerns," TIME, Jan. 8, 2022, *available at* https://time.com/6137882/dc-jail-conditions-january-6/.  Mr. Green has already been subject to such conditions for over two-and-a-half years, warranting a sentence well below any applicable guidelines range.

## **CONCLUSION**

For all of the above reasons, Mr. Green submits that a sentence that is substantially below the Guidelines range is appropriate, fair, and reasonable in light of the applicable sentencing considerations.

Dated: Washington, D.C.
          May 10, 2023

Respectfully Submitted,

A.J. Kramer
Federal Public Defender

/s/ _____
Michelle Peterson (Bar ID: 438930)
Assistant Federal Public Defender
For the District of Columbia
625 Indiana Avenue, N.W.
Washington, DC 20004

/s/ _____
Kevin B. Collins (Bar ID: 445305)
Shadman Zaman, *Pro Hac Vice*
Taylor Glogiewicz, *Pro Hac Vice*
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956

## **CERTIFICATE OF SERVICE**

I hereby certify that I caused copies of the foregoing to be transmitted to counsel registered

to receive electronic service.

Signed,

/s/_____
Kevin B. Collins (Bar ID: 445305)
Covington & Burling LLP
One CityCenter
850 10th St NW
Washington, DC 20001-4956
(202) 662-6000

*Counsel for Demetrius Green*